Dear Representative Carmody:
Your request letter of July 24, 2008, presented us with an interesting specific factual scenario, and asked us to give you our opinion on the legal consequences thereof. While your request cited specific facts, and included copies of recorded documents supporting same, we are revising your specific facts into a hypothetical situation (using the same factual dates, and language of reservations of mineral rights). We do this because of the enormous economic effect the Haynesville Shale oil and gas field is having in your District 6 and surrounding areas, and thus we hope that this Attorney General Opinion may be of aid to many landowners, attorneys, and State officials facing the same or similar factual and legal situations as those that you presented to us for review.
The factual situation you presented us is hypothesized, as follows:
(1) A sells to B a tract of land [hereinafter "the subject land", butonly as to that portion later sold by B as described in (2) below] on May 26, 1969.[1] In this 1969 deed, A reserved all mineral rights by the following language:
 . . . especially reserving, however, unto Vendor (his heirs and assigns) all oil, gas and other minerals in, on and under or that may be produced from said lands, which are conveyed expressly subject to this reservation.
(2) B sold a portion[2] of the subject land to the Louisiana Wildlife Fisheries Commission by deed dated September 29, 1972 (recorded, say, October 9, 1972), with B purporting[3] to reserve all mineral rights with the following language: *Page 2 
 The property herein described is conveyed subject to all outstanding valid subsisting oil, gas and mineral interests presently reflected by the records of the Parish of Bossier, however, Vendor expressly reserves unto himself, her heirs and assigns in perpetuity, an imprescribable mineral servitude covering and affecting all minerals in and under the grants conveyed of every nature and kind whatsoever, said mineral reservation to be exercised subject to reasonable regulations by Purchaser in respect to the use of the surface of the land, and which reservation is made to the full extent permitted under the provisions of LSA-R.S. 9:5806. (Emphasis added.)
(3) While not expressly so stated in your request letter, from its tenor we have assumed that there had not been good faith drilling operations on, or production from or attributable to, the subject lands, or lands pooled therewith, sufficient to interrupt the 10 years liberative prescription of nonuse running against the mineral rights reserved by A in 1969.
(4) Likewise, we have also assumed from the questions posed in your letter that the subject lands are still owned by the Louisiana Wildlife Fisheries Commission, or by the State of Louisiana or an agency of the State included within the ambit of the laws herein quoted.
Article 214 Louisiana Mineral Code[4] (herein sometimes simply "LMC") provides that: *Page 3 
 The provisions of this Code shall apply to all mineral rights, including those existing on the effective date hereof [January 1, 1975; Section 6 of Act 50 of 1974]; but no provision may be applied to divest already vested rights or to impair the obligation of contracts.
The sale from A to B, reserving all mineral rights, took place in 1969, before the effective date of the LMC, but the uninterrupted liberative prescription of 10 years nonuse running against A's reserved mineral rights accrued in 1979, after the LMC's effective date. It is our view that in a case such as that presented here, it is likely — and proper — that the date of the sale would control what statutory law would prevail, not the date of the accrual of the 10 year prescriptive period. However, it is not necessary that we here opine on this issue with certitude, as the legal result is the same whether La.R.S. 9:5806
(effective in 1969), or LMC Arts. 149, 150 and a part of 151 (as all read effective in 1979), all of which are hereinafter quoted, is/are applied.
La.R.S. 9:5806 was last amended [prior to its repeal in 1974 (effective January 1, 1975)] by Act 528 of 1960, Section 1, so that Sub-section B thereof provided, as follows:
 B. When land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the State Department of Highways, the State Department of Public Works or by any of the several levee districts in the state, or by the State Department of Wildlife Fisheries, or by a police jury, school district, school board or other board, or by any commission, or any political subdivision authorized to incur debt and issue bonds under the provisions of the Constitution and statutes of the State of Louisiana, heretofore or hereafter created or established by the State of Louisiana, from any person, firm or corporation, and by the act of acquisition, order or judgment, oil, gas or other mineral or royalties are reserved, the right so reserved shall be imprescriptible and shall remain vested in the person, firm or corporation from whom the land was acquired, condemned or expropriated, or in the heirs or assigns of that person, firm or corporation; provided, however, that should the ownership of such *Page 4 
land pass into private hands, the prescription of non-user provided by R.C.C. Arts. 789 and 3546 shall apply as in the usual case, or the land so acquired is by the act of acquisition conveyed subject to a prior
sale or reservation of oil, gas or other minerals or royalty, still in force and effect, the rights so reserved or previously sold shall prescribe for non-use by the owner thereof, but such rights shall revert to the owner of the land at the time of its acquisition, condemnation or expropriation by the state governmental agency, or to said owner's heirs or assigns, rather than to the owner of the expropriated land at the time of reversion; provided, however, that should the ownership of such land pass into private hands, the prescription of non-user provided by R.C.C. Arts. 789 and 3546 shall apply as in the usual case. (Emphasis added.)
We think it is clear from the language of R.S. 9:5806[5] that prescription against A's "prior . . . reservation of [all] oil, gas [and] other minerals" continued to run and his mineral rights prescribed in 1979; and the prescribed mineral rights inured to the benefit of B, "the owner of the land at the time of its acquisition . . . by the state governmental agency", and not to the Louisiana Wildlife Fisheries Commission, "the owner of the . . . land at the time of reversion".[6] *Page 5 
In the highly unlikely event — we opine — that a Louisiana court were to hold that the Mineral Code, rather than the former La.R.S. 9:5806(B), were applicable because B's mineral rights reservation did not prescribe until 1979, after the 1975 effective date of this Code, the applicable LMC articles would be 149 and 150, and the first sentence of 151. In 1979[7] Article 149 read, as follows:
 When land is acquired from any person by the United States or the state of Louisiana or any subdivision or agency of either by conventional deed or other contract or by condemnation or expropriation proceedings and by the act of acquisition, order, or judgment, a mineral right otherwise subject to the prescription of nonuse is reserved, the prescription of nonuse shall not run against the right so long as title to the land remains in the government or any of its subdivisions or agencies. If, however, the land, or any part thereof, is transferred by the government or subdivision or agency to a private owner, the prescription of nonuse shall apply as in the usual case but shall commence only from the date on which the act of acquisition by the private owner is filed for registry. (Emphasis added.)
And in 1979, [8] Article 150 read, as follows:
 When land is acquired in the manner prescribed in Article 149, the prescription of nonuse shall continue to run against any then outstanding mineral rights
subject to such prescription and shall accrue in favor of the owner from whom the land was acquired.
Thereafter, the prescription of nonuse shall not run against such rights except as provided in Article 151. (Emphasis added.)
Article 151 of the LMC is also, in part, applicable to our hypothetical reversion of mineral rights in 1979.[9] It read in 1979, as follows:
 Article 150 is applicable only if the government, governmental subdivision, agency, or legal entity with expropriation authority remains the owner of the land at the time the mineral right is *Page 6 extinguished. If the land, or a part thereof, is transferred by the government, subdivision, agency, or legal entity with expropriation authority to a private owner, the prescription of nonuse shall commence or resume as to the whole or the part in question from the date on which the act of acquisition by the private owner is filed for registry and shall accrue in his favor. (Emphasis added.)
Only the emphasized first sentence of LMC Art. 151 is pertinent to our discussion, as under our assumed facts, the subject land is still owned by the "governmental subdivision [or] agency" to whom B sold such property in 1972.[10]Thus, under the express wording of the then-in-effect LMC Art. 150, the prescribed mineral rights of A would "accrue in favor of" B, "the owner from whom the land was acquired" in 1972 by "State . . . Agency" expressly subject to A's reservation of mineral rights in his sale to B in 1969, rather than to A, or to B's vendee and the 1979 surface owner of the subject lands, the Louisiana Wildlife Fisheries Commission.
For the reasons above set forth, we are of the opinion, that under the facts you present in your request, the mineral rights in, to, on, and under that portion of the land that B acquired from A in 1969 with reservation by A of all mineral rights, and that B later sold in 1972 to the Louisiana Wildlife Fisheries Commission with reservation of all mineral rights, [11] and which mineral rights in favor of A prescribed in 1979, are now owned by B, and not by either A or the present surface owner (the Louisiana Wildlife Fisheries Commission). Consequently, unless B (or her heirs or successors) has alienated all or a portion of such mineral rights by a transaction that we are unaware of, the right to grant an oil, gas, or mineral lease on the subject land is vested exclusively in B, her heirs or successors.
It is important to note that this Attorney General Opinion is expressly limited to the factual data recited herein. This is because a change in date of either the date of sale from A to B (and thus the date when the reserved mineral rights of A would prescribe, absent an event sufficient to interrupt same), or from B to the State of Louisiana, or any of its subdivisions or agencies, could possibly change the result in legal ownership when any reserved mineral rights prescribe. Likewise, this opinion is limited to situations with express mineral rights reservations by both A and B, and with reservation language substantially similar to that quoted above, and of the same practical legal effect. Also, this Opinion is *Page 7 
limited to a sale by B to the State of Louisiana, or its subdivisions or agencies, and not to the United States of America, or its subdivisions or agencies, as, depending upon the date of B's sale to the federal entity, the legal result could be different from the ownership of mineral rights as opined upon herein. In short, all of these factors could affect the mineral rights ownership upon accrual of 10 years liberative prescription of nonuse of the prior reserved mineral rights.
In conclusion, it is the opinion of this Office that under the factual situation discussed herein, the mineral rights reserved by A in the sale of land from A to B prescribed in 1979 and, as a result, inured to the benefit of B. Because the acquisition of land by the Louisiana Wildlife Fisheries Commissions from B contained a mineral reservation in favor of B, it is further the opinion of this office that these mineral rights are therefore now owned by B, and not by the present surface owner — the Louisiana Wildlife and Fisheries Commission.
We trust we have satisfactorily answered your question, but if you need anything further please contact us.
 Very truly yours,
 JAMES D. CALDWELL ATTORNEY GENERAL
 By: __________________________ Andrew J.S. Jumonville Assistant Attorney General
 JDC/AJSJ/tp
[1] The Deed you furnished to this Office is dated May 26, 1969. This date is important, as there would have been no need to discuss herein the Louisiana Mineral Code, if both the date of the deed and the date of 10 years prescription would have been before the January 1, 1975 effective date of this Code. See the last clause of Article 214 of the Mineral Code, hereinafter quoted.
[2] Your letter implies that B sold all of the land she had acquired in 1969 from A. However, as we interpret the description of lands in the 1972 deed, it appears that B sold therein only 378.84 acres of the land she had acquired from A (i.e., the subject land). While no "acreage call" is given in A's deed to B, your letter advises the 1969 deed conveyed 699 acres.
[3] Actually, under the case of Hicks v. Clark, 225 La. 133, 72 So.2d 322
(1954), since in 1972 all the mineral rights were still vested in A, B had nothing in the way of mineral rights to reserve. The Hicks v. Clark
rule has been codified in Louisiana Mineral Code ("LMC") Articles 76, etseq., to wit: "The expectancy of a landowner in the extinction of an outstanding mineral servitude cannot be conveyed or reserved directly or indirectly." LCM Art. 76. Nevertheless, by statute, the purported reservation of all mineral rights by B has significant legal ramifications. See, La.R.S. 9:5806 and LMC Art. 149, et seq., as hereinabove later quoted in the body of this Opinion. The former statute has been repealed, and the latter amended several times, with the "etseq." Articles repealed in 2004. All of this is later discussed in further detail. [It is, however, interesting to observe that the latest 2004 Amendment of LMC Art. 149, in Sub-section D(1), attempts to clear up any confusion in this regard, by providing:". . . if (1) the instrument or judgment by which the land was acquired expressly reserves or purportsto reserve the mineral right to the transferor, whether or not thetransferor then actually owns the mineral right that is reserved, . . ." (Emphasis added.)]
[4] LMC Art. 1 stipulates:
 This Title shall be known as the Louisiana Mineral Code. The provisions hereunder may be referred to or cited either as Articles of the Mineral Code or as Sections of the Revised Statutes. Thus Article 30 of the Louisiana Mineral Code may also be referred to or cited as R.S. 31:30.
Whenever reference is made herein to an Article of the Mineral Code, the same shall also relate to the corresponding Section of the Revised Statutes.
We will use in this Attorney General Opinion only the "Articles of the Mineral Code" method of citation, as "hoped [for]" in the Comment to Art. 1 "[to] grow" as "the preferred practice".
[5] From the language of B's mineral rights reservation in the sale to the Commission, as previously set forth, we do not think there is any question that former La.R.S. 9:5806 would be applicable to such reservation. However, based upon the material you sent for our review, let us further hypothesize that there is a Resolution attached to the recorded deed, signed by the Director and Secretary of the Wildlife 
Fisheries Commission, authorizing the purchase of the subject land. The Resolution further acknowledged B's reservation of all mineral rights, in language virtually and in substance identical to B's reservation of mineral rights as above quoted, but goes even further by adding after the last clause the emphasized verbiage in the following quotation ". . ., which reservation is made to the full extent permitted under the provisions of LSA-R.S. 9: 5806, which are acknowledged by the parties tobe applicable." (Emphasis added.) Surely, in our view, this acknowledgement by the Purchaser removes any doubt there might be regarding the applicability thereto of B's reservation of mineral rights, and that it is to be under the provisions of former La.R.S. 9:5806. This analysis is, however, hypothetical and is presented herein in the interest of completeness with the expectation that this Opinion will be used in similar scenarios in the future.
[6] We attach no significance to use only of the word "expropriated" before "land", in the Latte Portion of La.R.S. 9:5806(B) instead of the more proper verbiage "acquired, condemned or. expropriated land". To do otherwise would be to make a distinction between "condemned land" and "expropriated land", which would be nonsensical. Nor did the Redactors of the LMC give this any credence: In the Comment to prior LMC Art. 150, it is pointed out that under the "old law" [La.R.S. 9:5806 (B)]: "If [B] sold land to the [Louisiana Department of Highways] subject to a 1/16 royalty created three years previously in favor of [A] . . .prescription would have continued to run against [A] and would accrue in favor of [B] seven years after the acquisition by the state agency." [This comment also points out that because of the "disparity between the provisions of La.R.S. 9:5806 (A) and (B)", both now repealed, under this exact same factual situation, except that B "sold land to the United States", instead of a state agency, "the royalty would have become imprescriptible in the hands of" A.]
[7] The first amendment of LMC Art. 149 did not occur until Act Nos. 348
and 371 of 1980.
[8] The only amendment to LMC Art. 150 prior to its repeal by Section 2 of Act No. 919 of 2004, was merely one of clarification. Section 1 of Act No. 550 of 1976 changed the wording in the first sentence, after the words "shall accrue in favor of the owner": From "of the land at the time of such acquisition": To "from whom the land was acquired."
[9] This Article 151 was also repealed in 2004 by the same Act No. 919 that repealed LMC Art. 150. Prior to repeal, it had been amended (merely to clarify) only once, and that was by Act No. 348 of 1980, after our critical date of 1979, and thus is not of importance to our issue.
[10] While well beyond the scope of this Attorney General Opinion, we simply note as an advisory "superabundance of caution" that if one finds oneself in a situation where the critical time period is between the effective dates of Act No. 37 of 1990 and Act No. 745 of 1991, to observe very carefully the 1990 Act's wording of the ending of LMC Art. 149(A) Vjz., ". . . or is subsequently transferred to a thirdperson, public or private; (Emphasis added.)
[11] See Footnote 3, supra.